Good morning, your honors. Devin Burstein and Richard Barnett on behalf of Ms. Rains. Your honors, I will be addressing the counts of conviction and Mr. Barnett will focus his attention on the forfeiture issues to the extent the court has questions. Your honors, this case represents a classic round peg in a square hole. One time, Ms. Rains transported two undocumented people from a safe house within the United States, a few miles within the United States to her home, and there she cared for them for a few days. The government, however, not content with the transportation and harboring offenses that actually fit the facts, tried to shoehorn in a brings to offense because it carries the mandatory minimum punishment. But on the record here, under any theory, Ms. Rains did not commit that offense and therefore we're asking the court to vacate counts two and three as well as the accompanying sentence. So they had two theories. They had two theories. Right, aiding and abetting. Correct. And a Pinkerton theory. Correct. And both fail. Why? Beginning with aiding and abetting, it's our position that this court doesn't have to go any further than Judge Reinhart's en banc decision in Lopez to conclude that the aiding and abetting conviction fails. It's undisputed here that the two undocumented people, the Galvans, were at a safe house within the United States before Ms. Rains reached them. Therefore, under Lopez, there can be no dispute that the brings to offense was complete at that point. When they arrived at the first safe house. Correct. That this court's clearly established law. Ms. Rains, there's no evidence that she acted extraterritorially. Thus, just like the defendant in Lopez, and I'll quote, the transportation came only after the aliens had been dropped off in the United States and therefore cannot serve as the basis for sustaining a conviction for aiding and abetting a brings to offense. Well, the government says, but there were calls. There were calls. She called Kiro, the main smuggler. Well, in this case, the calls add nothing. First of all, they didn't connect. Second of all, they weren't extraterritorial. They also say other things, don't they? Yes. They say that she met with the smugglers weeks before, that she agreed to the use of her ranch, that she established a code word, that she agreed to take in a certain number of aliens. Correct. Maybe even beyond these two. Well, perhaps, but speculation is not evidence. And those things make her guilty of harboring. They make her guilty of transportation, but they don't make her guilty of the brings to offense. And we have that quote from Lopez here that says, the court needs to be careful to maintain the distinction between the offenses. And the actual quote is, specification of the category of the aiders and abettors must take into account and attempt to avoid redundancy with the separate offenses Congress created. At bottom, whether the court looks to aiding and abetting or conspiracy, if the government is correct that merely agreeing to transport and harbor undocumented people at a safe house within the United States is enough to establish guilt as a principle for brings to offense, the court would destroy the distinction between those offenses. There is no doubt the government proved Ms. Rains was guilty of transportation. The government proved Ms. Rains was guilty of harboring. We're here because they took a step too far. And that's our argument. I'm happy to answer any question. What about the Pinkerton theory? Talk about Pinkerton. So under the Pinkerton theory, the government's essential response is, well, we don't have to prove the name of the person who did that. And, yes, that's true. But they have to prove one of the conspirators committed that offense. You can't be conspiratorially liable unless one of your co-conspirators has committed the offense. Now, why is Ms. Rains does not, why doesn't Ms. Rains fall into that category is, I think, the court's essential question. Well, there's a couple of reasons. First, as Your Honor just noted, really the scope of the conspiracy she agreed to was to harbor and transport people. She's not part of a brings to. It's totally irrelevant to her role. Second, the government failed to show that any of the people it tied to Ms. Rains, any of her co-conspirators, were, in fact, guilty of the brings to offense. Now, we can certainly speculate that maybe Quiro and his wife had some connection. But there was no evidence that they did. For example. I mean, there's no evidence they had communications with the smugglers in Mexico? Or the Galvans in Mexico. Both. There's no evidence as to either of those facts. There was no evidence that they communicated with or aided the smugglers in Mexico, as Your Honor just noted. There was no evidence that they spoke with the Galvans. Certainly, they didn't show up at the fence that day. There was also no evidence about the man at the initial safe house. Now, somebody brought the Galvans to the United States. But the government is missing a critical link. There's no link between whoever that person was and Ms. Rains. And again, that critical link is necessary. Because if it's not there, what you have is guilt, essentially de facto guilt. If you transport, if you harbor, you're suddenly guilty, and you do it within San Diego County. You're almost certainly going to then be guilty of a brings to offense that carries the mandatory minimum. Because those offenses, they tend to follow. I mean, we know that. Somebody is brought to, then they're transported and harbored. But they're separate offenses. Congress has created the distinction, and it has done so with different penalties. All we're asking for is for this court to maintain that distinction. Thank you. I want to share the rest of your, some of your time with, do you have a question? No, he's going to talk about the work that you're doing. Thank you. Good morning. I'm Rick Barnett, and I'm addressing the forfeiture issues, if I could. Before you even start, was the house sold? The latest news I have is a couple months old, and it was not sold yet. So the expedited sale order really wasn't an expedited sale? It really wasn't. There were a number of problems of rural property, and there were a number of some environmental issues, and some other issues. So when I spoke to the customs agent involved in that a few months ago, it still had not been sold. Okay. The first issue I'd like to address, obviously, should we be successful on the arguments that Mr. Bersening just brought to the attention of the court, that in and of itself is a reason to remand. Well, couldn't the government get forfeiture just on the basis of the other convictions? They could. The problem is the district court specifically referenced the minimum mandatory sentence imposed in this case at page 607 of the record, and also emphasized that we have seven counts where misreigns is found to have conspired with others to bring the aliens in for financial gain. That's at page 665 of the record. So if those convictions are set aside, the district court may well reconsider whether the forfeiture is excessive in this case. But basically, you're saying that if those convictions are set aside, not that forfeiture is necessarily reduced, but that because the district judge relied on things that would no longer be in the picture, the district judge should have the opportunity to take another look at it. Exactly. Number two is the fact that the district court applied the wrong standard in this case. What the district court was required to do, as referenced both in Bocciacchian and in the Northwest Thurman case, is apply what we call the four factors, the nature and extent, so on and so forth. What the district court did, the error was compounded here because not only did it not apply those four factors, but applied the wrong factors, looking at sentencing factors, at punishment and deterrence, as is set forth extensively in the briefs. And it's clear through the Hickson case and the additional case that we cited in the briefs, Mancini's forest, that where the court applies the wrong standard, does not apply the right test, it has to be remanded. Going to the four elements itself, I think that they have been addressed pretty distinctly in the briefs, but it was clear that there was the nature and extent of the involvement of this property. This was a property she lived at for many, many years, and it was involved in one week of conduct here. I won't go through all the things that she didn't do in this case. There's no evidence in the record at all that there was any other use of the property? That is correct. None? Zero. Just this particular incident. This was a one-time shot. The activities were not related to any other illegal activity. I mean, that's clear from the record as well. When we get to the third factor, the other penalties, this was a huge problem in this case. What the district court did was essentially say, well, the maximum fine is $250,000. That's the end of the inquiry. Well, wasn't he concerned about, I think there's, I forget which case, where there's a statement that if the forfeiture amount is within the fine range, it's presumptive of a case. Well, there is some case law to that effect. However, this Court has very clearly said that the maximum penalties under the guidelines should be given greater weight than the maximum penalty authorized by statute. And that's the Northwest Thurman case. And every other case I could find from the circuit has said the same thing. Right. He didn't, it doesn't appear that he took that into consideration. Not at all. And the guideline range was, you know, $3,000 to $30,000 here. We have a forfeiture six times that. And I went to the effort, as reflected in a footnote in the reply brief, to look at every alien smuggling case for that year and the two previous years in San Diego. There were 1,715 defendants, 555 cases. There were a total of four fines in all of those cases. The largest fine was $2,500. The total fines, I think, were about $5,000. And in other words, this forfeiture was 80 times the largest fine that had ever been imposed in those three years. And we're talking about cases where they're putting people in hidden compartments in vehicles, in the engine compartment, incredible danger to them, and so on. And it was 33 times the fine, all the fines combined. And so I think, and then finally, you know, before the Northwest Thurman case is what we call the Little Canyon Road case, which was a Ninth Circuit case that came after the Austin case, that said, well, what are the standards here? And one of the factors they looked at was the hardship to the family. And this court has clearly said that you can still consider these other factors, was the hardship to the family. This family's been thrown out of this home. This was their family home for one week of conduct. It is constitutionally disproportionate, and we urge the court to reverse the forfeiture. Okay. Thank you. Please, the Court, Benjamin Hawley for the United States. To begin with the forfeiture, if that's acceptable to the court. Sure, whatever you. So the reason we, first of all, in terms of what the district court did, we didn't spend a lot of time in our brief discussing that, and the reason is because this court's review is ultimately de novo. So to the extent there were factual findings, those obviously would be subject to some reference, but the legal analysis here is up to this court de novo. So looking at the Bajikashian factors, which this court should do and we do, they're somewhat ill-fitting because they're primarily designed or primarily, I guess, used in cases where it's actual cash, maybe drug proceeds or otherwise, that are going in or out of the country. And so it's a little bit ill-fitting, but I still think those factors demonstrate the forfeiture, or at least that Ms. Raines has not shown the forfeiture was so grossly disproportionate as to be unconstitutional. First, in terms of the... It was quite severe. It's a significant forfeiture, yes. But we don't believe it's so grossly disproportionate that it becomes unconstitutional at that point. What if we were to, we're going to get to the merits, but suppose those first two convictions get reversed. Should it go back just in light of the comments of the judge? It would not need to, but it would change primarily that third factor, the other penalties that may be imposed, that analysis could change. I think this Court could, again, because it's de novo, still ultimately affirm on the forfeiture, but it would also make sense to send it back for the district court to take a look at in the first instance. We, of course, believe it should be affirmed. So let's assume now that those convictions are affirmed. Why isn't this grossly disproportionate? I mean, so we, our case law does say that the judge should take into account the guideline. Yes. But if you look at the guideline fine range, and here it was $3,000 to $30,000, and the government forfeits, it obtains forfeiture of a house that has, I guess, an equity value of $170,000. Correct. So, two responses. That's a pretty significant difference. It is. Yes. And I don't want to minimize or try to tell this Court that this is not a significant forfeiture. It is. But two responses to your concern there. First is that we should look at the guidelines, but as this Court and other circuits have also held, ultimately, we're, the legislature is the one that is making the determination here in terms of the maximum fine. And so there's a presumption of constitutionality if it's under the maximum. So we're at least in the presumption land there. Second, this Court has also upheld forfeitures that were much higher even over the guidelines. I would point primarily to U.S. v. MACB. There the maximum guideline fine was $75,000, and the forfeiture was nearly 10 times that, $729,000. So it's not unprecedented to have a significant break over that. And it comes down to the facts. And here, this was a one-time incident in the sense that there were only these two aliens that were at the ranch. However, Ms. Raines had essentially an open invitation to use her ranch, and there was discussion of using it for alien smuggling primarily, potentially also drug smuggling. That never came about. I don't know why, but it never came about. But it wasn't like she was agreeing to just this one incident. It was an open-ended invitation. But there was no evidence, as I asked the defense counsel. There was no evidence that it was used for any other wrongdoing. Is that correct? Correct, correct. It was an agreement to do so, but the actual incident was this time. And in terms of some of those other factors, for example, whether it was related to other illegal activities, the nature and extent of the crime, this wasn't like in Bajikashian where it was legitimate money going for a legitimate purpose that simply wasn't reported. As the Supreme Court found, that was minimal culpability, essentially not something the government should be particularly interested in. Here, we have an international smuggling conspiracy and an open-ended invitation to continue to use her ranch as... What did she do before these people were in the United States to make her guilty of aiding and abetting bringing them into the United States? Two primary things. First is she met with the smuggler, with Ms. Esmondola beforehand. And that's where she set the terms of what she was willing to do, that she was willing to use her ranch at all. She met with who beforehand? I believe it was Ms. Esmondola, one of the other people that we're alleging was part of the conspiracy. So she said, you know, we can use the ranch. She set up code words and she set her price, which was $150 per alien, how many at a time, how long she would be willing to house them. She set all of that up. Then she also, once the aliens were across transported, went to pick them up. So there was at least some coordination ahead of time to know where to go and when to go. Picked up the aliens, brought them back to her house, and then housed them there for, I believe, about five days. But didn't, haven't all the other cases that we've, that this court has found sufficient evidence in, Lopez, Hernandez, Orlano, Noriega, Perez, shown much more evidence of the involvement in the bringing into the United States and a connection between this defendant's activities and the cross-border transportation? Well, I think to answer that, ultimately, the question comes down to, is this case more like Lopez or more like Noriega Perez? And Noriega Perez, there was more evidence in the sense that it was a, it was a long-going, or ongoing, long-term smuggling offense. And in that case, the defendant rented two separate houses. So he didn't have, as far as the case shows, any interaction with that one, but knew that they were using it as a load house. And that was still sufficient. Also Noriega Perez, some of those aliens were dropped off at a different house first, then ultimately came to Noriega Perez's house to be harbored. And that was still found to be sufficient. Also here, so Ms. Rains, besides the connections that I already mentioned, the setting up ahead of time, they're going to pick them up, which reveals coordination. She wasn't merely passive once they got there. She was actively communicating with. But that's not the offense. The offense is bringing them into the country. So, of course. But what I, I guess that goes more to the forfeiture then, in that she's, she's setting up, the point I was making is she's trying to tell the, who turns out being the undercover agent, when the checkpoints are down. She, she's part of this ongoing, longer-term conspiracy. Once they're here and once they're at her ranch. Yes. But the point is that that indicates she's not merely receiving aliens and then they go on. She's, she's part of this group to make sure they get across and get to where they're going. Do you have any idea who the smuggler was? In terms of the actual person coming across the fence? Who brought them over? No. Did she know the names of the people that were being brought over? Not before they got there, no. Before they got where? To her, to her, when she picked them up. But she did coordinate again with the Escondolas and they're the ones who are putting all of this in motion. So is your argument that the simple fact that she was willing to house these folks, this couple, or their brother and sister, right, brother and sister, that that's enough for aiding and abetting? Not that alone. So our argument is. That's not what Lopez said. Agreed. And the arguments that counsel were making about how this would essentially destroy the offenses is exactly the argument that the dissent made in Noriega Perez. And so what Noriega, the majority in Noriega Perez, said to diminish those concerns is that you need a nexus between the defendant's actions and the cross-border transportation of the specified aliens. And what's the nexus here? So here, the nexus again is that she was setting this up ahead of time. It's, we have to look at her actions beforehand. Plus you're back, you're back to the fact that she was willing to allow her house to be used in that, in some way, I guess, encouraged or, you know, prompted. And it doesn't need to be a. Yeah, the couple, the couple to then make arrangements to bring the brother and sister into the United States. That sounds just like Lopez. It's not because, it doesn't need to be a but-for cause. In other words, the Espindolas could have smuggled other people without using that ranch, doesn't mean that she wasn't aiding and abetting. It just needs to encourage them to do so. And here, they talked about how this was a very easy job at a ranch and the undercover agent talked about why it would be used, because it's a perfect place for smuggling. That's before the checkpoint. She needs only to encourage them to do so. To do what? To bring the, to bring to offense. Well, is there evidence that she participated in encouraging anybody to bring aliens into the United States or only that she encouraged people to, once they were here, move them from point A to her ranch? She encouraged them to bring them across because of the use of her ranch. Her ranch, besides being perfect in terms of location or in terms of geography, it was before the checkpoint. So it's not like they would get into the U.S. and then she was just a random stop. She's necessarily one of the very first stops being close to the border. I'm sorry to interrupt you. Let's go. Let me ask you about Pinkerton, and maybe I just don't understand Pinkerton, but Pinkerton is cited in the indictment or the information, I guess it is. Right. In the two substantive counts, not in the conspiracy count. Correct. And does that automatically turn those two counts into conspiracies? It indicates that there is a conspiracy. Indicates to whom? To, well, so the jury was instructed about conspiracy. Now, the jury was told that if you find that the defendant conspired with someone then you can turn these two counts into a conspiracy or you can turn them into a different kind of aiding and abetting. It was more that if you find, essentially, if you find that she was conspiring, that would be to bring across, that would be sufficient. And why didn't the government say to the judge, we need to name a particular person she was conspiring to? Is it because you didn't have any idea who you thought she was conspiring with? I believe the reason is because the other conspirators that we knew about, at least the Espindolas in particular, were not named in the information in counts two and three. So what? So the government did argue in closing, though, that that's who she was conspiring with, with the Espindolas. Okay. So the jury was instructed if you find that she was conspiring with someone, but I'm not going to tell you who in this instruction, then you can turn these substantive counts into a conspiracy. And I leave it up to the government to explain all this to you. I'm not going to. They're going to give you your theory. I'm not going to tell you anything about the law. I would disagree with that last section about not telling about the law, in that the jury was instructed what a conspiracy is, what it means, what we have to prove, what Pinkerton is, what it means, what we have to prove, and the substantive offenses. And were they, was the jury instructed that in connection with count one or in connection with counts two and three? The conspiracy would have been with count one. I believe, I believe the Pinkerton instruction came with two and three, but I would have to double check the record. So under Pinkerton, you can turn substantive counts into conspiracies. You can show that the defendant is liable for the substantive account count if she conspired with others. Okay. I see I'm out of time, so I will submit unless the court has a question. Thank you. Thank you. So one of you can rebut. I'll take the honor. You get to give you a minute for rebut. You're going to take the honor? You're going to do honors for both? I will, Your Honor. Okay, good. First, in terms of the substantive offenses, the government pointed to two things. It said, the meeting, you asked, what's the evidence beyond Lopez? And it said, well, the conversation, the meeting with Ms. Espindola beforehand about the transportation and harboring and the transportation after. Those were the two factors. So the first one is dealt with in Singh, in fact, and I know Your Honor was on that panel. And Singh holds, preparatory calls involving planning for the transporting of an illegal alien within the United States are not enough to establish intent to aid a brings to offense, period. Preparatory planning, that doesn't cut it. Then we're asked the transportation after, plainly, that can't cut it because the offense has come to an end. That's the black letter law that follows after Lopez. In terms of Noriega-Perez, that's where the government essentially hangs its hat. And I think we're happy with that because if Noriega-Perez sets the standard for what you have to do, misreigns conduct wasn't, it's not a difference in degree. It's a difference in kind. I think in the brief, we lay out that Mr. Noriega-Perez was a professional, deeply involved with hundreds, if not thousands of aliens coming through his property on a regular basis. This is a one-time thing. The government suggested that making her house available somehow prompted this offense. And we just simply know from the record that's not true. The Espindolas were smuggling within the United States before that. Finally, in direct question, Your Honor, Pinkerton cannot turn a substantive  It's not, it can't transform it magically. It's not a theory of conspiracy. It's a theory of substantive liability. So if you put Pinkerton in, you can't then say there's a conspiracy in there. It doesn't follow. So the answer to your question is no. Thank you. Thank you. Matter submitted.
judges: Reinhardt, Paez, Friedman